**HILTPOLD et al. v. STERN.**

No. 1067.

Municipal Court of Appeals for the
District of Columbia.

Submitted May 28, 1951.

Decided June 28, 1951.

Evan T. Davis, Washington, D. C., for appellant.

Arthur F. Carroll, Jr., Washington, D. C., for appellee.

Before CAYTON, Chief Judge, and HOOD and CLAGETT, Associate Judges.

CLAGETT, Associate Judge.

Elizabeth A. Stern signed a sales contract for the purchase of a lot owned by defendants. Alleging that she was induced to sign this contract in 1946 by the fraudulent misrepresentations of defendant Harold Hiltpold, she brought this action in 1949 [1] to recover certain payments she had made totaling $1,560 and to cancel the contract.[2] The action was tried without a jury. The court in a memorandum opinion found for the plaintiff and entered judgment for the amount claimed plus interest and costs. Defendants appeal.

Miss Stern is a middle-aged woman employed by a Government agency. She lived on the same bus route as defendant Harold Hiltpold and became acquainted with him in January 1946 while riding back and forth to work. Hiltpold himself worked for the Government and was also a licensed real estate salesman. Plaintiff testified that after several meetings on the bus she and Hiltpold became quite friendly. On one occasion, he asked her if she had any money to invest. On learning she had some money invested in Government bonds he advised her to invest her money in vacant land and asked her to come out and see some lots owned by himself and wife.

In the latter part of January, plaintiff went out to view the lots located near the Potomac River near the District line in the northwestern section of the city. They are adjoining lots and are described as lots 21, 22, and 36 in square 1452. Lot 21 is a corner lot and lot 22 is situated between lot 21 and lot 36. The selling price was stated by Hiltpold to be $5,500 for lot 21 and $4,500 each for lots 22 and 36. It was lot 36 that Hiltpold especially pointed out to the plaintiff. She testified that they walked over lots 21 and 22 and partially over lot 36, that she noticed a "depression" in the rear of lot 36 and inquired of Hiltpold, "Will it make any difference being the land is low?" and that he replied, "No, that doesn't matter much. They can fill that in. The main thing is the view." Hiltpold estimated that the lot could be filled in for $900.

Several days later plaintiff informed Hiltpold that she would buy lot 36. They agreed that the price would be $3,600. The parties met at a downtown bank and, according to the testimony of the plaintiff, she cashed some war bonds and gave Hiltpold $800 in cash. Five days later, on January 9, 1946, they signed a sales con-

---

1. The case was not tried finally until September 1950. It was partially tried previously, but a trial *de novo* was ordered by the first judge for reasons not here pertinent.

2. The judgment of the court did not actually cancel the contract. It was for money only.

tract providing for the $800 down payment and a $2,800 note payable $30 a month. This note was not secured nor was there any provision for interest. Apparently, when the amount was paid, plaintiff was to get a deed to the land. Plaintiff thereafter made two monthly payments and in January 1947 she made a payment of $700.

Plaintiff testified that she bought the lot because Hiltpold promised that he would sell it for her at a profit. She also testified that prior to her viewing the lots defendant visited her at her apartment and demonstrated by figures how if she would buy one of his lots for $4,500, making a down payment of $1,000, he could resell it for her for $6,500, and thereby bring her a profit of over $1,000. Her further testimony was that she would not have contracted to buy the lot but for defendant's assurance that he could and would resell it for her at a profit and that she had not consulted anyone else but had relied exclusively on defendant's advice; that she trusted him implicitly. She communicated with him several times during 1946 and repeatedly asked him when he was going to sell the lot. He assured her that he had certain prospective buyers but that nothing had materialized. Finally, on February 7, 1949, she filed this action to rescind the contract and recover the monies that she had paid.

Lot 36, which plaintiff agreed to buy, was described by an expert real estate appraiser, who appeared as a witness for plaintiff, as follows: It has a frontage of 50 feet on the sidewalk line and is irregular in shape though tending to be rectangular. On its north line it is 129 feet deep and on its south line 105 feet deep containing in all 6,617 square feet of ground. A portion of the front of the lot is level with the sidewalk for a distance back of about ten to twelve feet and then drops "precipitously" 35 feet. At the bottom of this drop there is a perennial stream which runs the entire length of the property and passes off of the lot through a culvert under Potomac Avenue. An open District storm sewer also runs through the property. The remaining portion of the front of the lot is not level. The expert testified that there was approximately 200 square feet which he said constituted all of the building area of the lot. The zoning regulations for that area require single-family detached dwellings. When asked if such a dwelling could be built on the lot the expert answered that it could not; that it would not be feasible and would be entirely impractical to attempt to fill the depression for the purposes of building. He estimated the value of the lot to be between $250 and $275. This was substantially corroborated by another expert witness for the plaintiff. His estimate of the value of the lot was $400. Defendants' own expert appraiser estimated the lot to have a value of $950.

During the course of trial evidence was admitted over objection of the defendants that an oral compromise agreement was entered into between the parties in July 1950. The terms of this settlement were that defendants would return $1,300 to plaintiff by paying $500 in cash and giving a $800 note payable in 18 monthly installments. Evidence of this oral agreement was established by the testimony of Miss Stern and by the testimony of an attorney who had previously represented defendants who told of certain offers and counteroffers made by the parties in June and July of 1950 and how the oral settlement was finally reached. Defendant himself testified to the same effect. However, the payments were never made and this attorney withdrew before trial. This testimony of the former attorney was objected to by the defendants on the ground that it involved privileged communications between attorney and client.

The trial judge in his memorandum opinion found that plaintiff was induced to enter into the contract by defendant Harold Hiltpold's promise that he would resell the lot for her at a profit and that after the contract of sale was signed he continued to promise to sell the property. He found that she had never bought or sold any other real estate and that she was inexperienced in the field of investments. The trial court also found that the contract was an "unconscionable agreement which is repulsively fraudulent."

■ We think there was ample evidence to support the findings and conclusions of the trial judge in this case. Harold Hiltpold was a licensed real estate salesman. He won the friendship and confidence of plaintiff, an inexperienced woman, before he sold her the lot, and promised her that if she would buy one of the lots he could and would resell it for her at a large profit. The general rule is that fraud cannot be predicated upon statements promissory in nature and relating to future actions. But that a purchaser, induced by false representations to buy property, may rescind and sue for the consideration paid is well established.[3] Especially is this true where the party who has won the trust and confidence of another takes undue advantage of his superior position and knowledge.[4] "It is a principle of law, as well as of natural justice, that greater consideration and care are due to persons known to be unable to take care of themselves than to those who are fully able to do so." Graffam v. Burgess, 117 U.S. 180, 6 S.Ct. 686, 689, 29 L. Ed. 839.

The original selling price was stated to be $4,500 for a lot which, even by the estimate of defendants' own expert, had a value of only $950. The fact that the final price was $3,600 would not detract from the gross discrepancy between its selling price and its actual value. Furthermore, it appears that the lot was useless for the only kind of building permitted there by the zoning regulations.

■■ A mere misstatement of value of property may be deemed a fraudulent misrepresentation of fact, where there is a special reliance placed upon it and superior knowledge on the part of the promisor, and where the misstatement is made under conditions which show that it was intended by the one uttering it to be treated as an immediate factor inducing action and was made with knowledge that it would be accepted as a basis of action.[5] The inexperience and ignorance of one of the parties, when contrasted with the superior knowledge of the other party, may make a misrepresentation as to value actionable which would not be if the dealings were between more equally matched parties.[6] We think the evidence in this case was sufficient to establish a finding of fraud justifying a cancellation of the contract and a return of plaintiff's money.[7]

■ The trial court further found that defendant Harold Hiltpold's whole course of conduct with plaintiff and his repeated promises to resell the lot for her after the contract was signed lulled her to inactivity and resulted in the delay in seeking to recover her payments. Again we think there was sufficient evidence to support this finding and that plaintiff did not waive her rights to reclaim her payments.

■ Defendants contend that evidence of the oral settlement agreed to by the parties after suit had been begun was improperly admitted on the grounds that offers to compromise are not admissible in support of a contested claim or defense.[8] However, this evidence was not as to a mere offer of compromise but as to a settlement actually agreed to by the litigants. A mere offer of compromise is to be protected because a party to a controversy is permitted in the interest of peace to tender such terms as to him shall seem proper, and if rejected by the other party it would be unfair to make use of it as an admission of liability. But it is usually considered

3. Owen v. Schwartz, 85 U.S.App.D.C. 302, 177 F.2d 641, 14 A.L.R.2d 1337; Turner v. Brewer, 54 App.D.C. 363, 298 F. 685; Ralph D. Cohn, Inc. v. Trawick, D.C.Mun.App., 60 A.2d 926; Borzillo v. Thompson, D.C.Mun.App., 57 A. 2d 195.

4. Hill v. Marston, 65 App.D.C. 250, 82 F.2d 856; Hammett v. Ruby Lee Minar, Inc., 60 App.D.C. 286, 53 F.2d 144, certiorari denied 284 U.S. 682, 52 S.Ct. 200, 76 L.Ed. 576.

5. F. H. Smith Co. v. Low, 57 App.D.C. 167, 18 F.2d 817; Byers v. Federal Land Co., 8 Cir., 3 F.2d 9.

6. McNabb v. Thomas, D.C.Cir., 190 F.2d 608.

7. See Battelle v. Cushing, 21 D.C. 59.

8. Firestone Tire & Rubber Co. v. Hillow, D.C.Mun.App., 65 A.2d 338. See Frese v. Gaston, 82 U.S.App.D.C. 173, 161 F. 2d 890.

that the rule excluding evidence of offers of compromise does not apply to a completed offer for a compromise, but such agreement may be shown, where it is afterward repudiated by one of the parties,[9] unless it is for some reason void. Here no suit could have been brought upon the oral agreement itself because the payments were not to be completed within one year and because it was not in writing.[10] But this did not render the compromise agreement void, only voidable.[11] Furthermore, admission of evidence of the settlement was not objected to on the ground of the Statute of Frauds.[12]

 Defendants also contend that it was error to admit the testimony of their former attorney as to the negotiations pending the oral agreement to settle. The attorney, by means of certain office records, testified as to certain offers and counter-offers which he communicated between the parties. Nowhere does it appear that there was a disclosure of any confidential communications between himself and the defendants in so testifying. The defendants intended that these proposals should be communicated to the plaintiff. The attorney-client privilege assumes that communications are made with the intention of having them remain confidential. The mere relation of attorney and client does not raise the presumption of confidentiality and communications made to an attorney for the purpose of being conveyed by him to others are stripped of their confidentiality and therefore are not privileged.[13]

Had the price of the land which defendant induced plaintiff to buy borne any reasonable relationship to its actual value as testified to by defendants' own expert, the situation might have been different. But we believe that the trial judge, who observed the witnesses and wrote a carefully prepared memorandum covering both the facts and the law, was justified, taking the case as a whole, in finding for plaintiff.

Affirmed.

9. Reese v. McVittie, 119 Colo. 29, 200 P. 2d 390; Union Trust Co. of Maryland v. Resisto Mfg. Co., 169 Md. 381, 181 A. 726; Harris v. Miller, 196 Cal. 8, 235 P. 981; Lane v. F. S. Miller Lumber Co., 101 Okl. 14, 222 P. 968; Dugger v. Kelly, 168 Iowa 129, 150 N.W. 27; 31 C.J.S., Evidence, § 290.

10. Code 1940, § 12–302.

11. Platt v. Bradner Co., 131 Wash. 573, 230 P. 633; Ex parte Farrow, 207 Ala. 197, 92 So. 426; 31 C.J.S., Evidence, § 284.

12. Rodenberg v. Dezendorf, D.C.Mun. App., 66 A.2d 210.

13. 8 Wigmore, Evidence, §§ 2311, 2312 (3rd ed.); Oliver v. Cameron, MacA. & M. 237, 11 D.C. 237; Fowler v. Sheridan, 157 Ga. 271, 121 S.E. 308; see Cafritz v. Koslow, 83 U.S.App.D.C. 212, 167 F.2d 749; Tutson v. Holland, 60 App.D.C. 188, 50 F.2d 338, certiorari denied 284 U.S. 632, 52 S.Ct. 21, 76 L. Ed. 538.